**Electronically Filed
Supreme Court
SCWC-17-0000695
26-JAN-2021
08:22 AM
Dkt. 20 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI‘I

---o0o---

EDELMIRA SALAYES ARAIZA,
Petitioner/Petitioner-Appellant,

vs.

STATE OF HAWAI‘I,
Respondent/Respondent-Appellee.

SCWC-17-0000695

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-17-0000695; CR. NO. 14-1-0162; S.P.P. NO. 15-1-0007)

JANUARY 26, 2021

RECKTENWALD, C.J., NAKAYAMA, McKENNA, AND WILSON, JJ., AND
CIRCUIT JUDGE BROWNING, ASSIGNED BY REASON OF VACANCY

OPINION OF THE COURT BY RECKTENWALD, C.J.

## I.  INTRODUCTION

Edelmira Salayes Araiza is a citizen of Mexico and a
lawful permanent resident (LPR) of the United States.  She has
lived in Hawai‘i for more than twenty-two years and has two
children, both of whom were born in the United States.  In 2014,

Araiza pleaded no contest in the Circuit Court of the Second Circuit to Theft in the First Degree, an aggravated felony under federal immigration law, 8 U.S.C. § 1101(a)(43), and to Welfare Fraud.  Her attorney advised her that pleading no contest would make deportation "almost certain," but that "[his office] had criminal defendants who were convicted of felonies who are not automatically deported" because immigration was "handled by federal authorities who do not oversee state courts."

Here, we are asked to determine whether counsel properly advised his client, Araiza, about the consequences of an aggravated felony conviction.  We hold he did not.  In order to be effective under the United States and Hawaiʻi Constitutions, criminal defense attorneys must advise their clients about adverse immigration consequences that may result from a plea of guilty or no contest.  Haw. Const. art. I, § 14; Padilla v. Kentucky, 559 U.S. 356, 368 (2010).  Despite her attorney's reference to deportation being "almost certain," when taken as a whole, his advice conveyed that there was a realistic possibility Araiza would not be deported.  In reality, Araiza was precluded from discretionary relief from deportation because of her conviction.  Budziszewski v. Comm'r of Corr., 142 A.3d 243, 251 (Conn. 2016) ("If counsel gave the advice required under Padilla, but also expressed doubt about the likelihood of enforcement, the court must also look to the totality of the

2

immigration advice given by counsel to determine whether counsel's enforcement advice <u>effectively negated</u> the import of counsel's advice required under <u>Padilla</u> about the meaning of federal law." (emphasis added)).  Araiza is therefore entitled to relief.

In light of our resolution of this issue, we decline to determine whether the Intermediate Court of Appeals (ICA) erred on the other points of error raised by Araiza.[1]  However, we offer guidance on one of those issues relating to qualifications of interpreters.  When a lower court appoints an interpreter who has not been certified by the judiciary as proficient in the applicable foreign language, it must conduct a brief inquiry to establish that the interpreter is qualified, as required by Hawai'i Rules of Evidence (HRE) Rules 604 and 702, and the Hawai'i Rules for Certification of Spoken-Language Interpreters (HRCSLI).

## II.  BACKGROUND

In March 2014, the State charged Araiza with Theft in the First Degree in violation of Hawai'i Revised Statutes (HRS) § 708-830.5(1)(a) (2014) and with Welfare Fraud in violation of

---

[1]     On appeal, Araiza raised four additional issues: (1) her defense attorney provided ineffective assistance of counsel by failing to negotiate an immigration-safe plea; (2) the circuit court's plea colloquy was insufficient under <u>State v. Ernes</u>, 147 Hawai'i 316 (2020); (3) her Rule 40 counsel had been ineffective; and (4) the circuit court committed plain error by appointing an unqualified interpreter for the Rule 40 hearing.

HRS § 346-34(b) and/or (c) (2015), alleging she had failed to report income, which resulted in a substantial overpayment of Supplemental Nutrition Assistance Program (SNAP) benefits over the course of several years.  Araiza had no prior experience with the criminal justice system.

At her arraignment, the circuit court[2] advised Araiza pursuant to HRS § 802E-4 (2014)[3]: "[Y]our case may have severe and irreversible [immigration] consequences, including immediate detention, deportation or exclusion from admission or denial [of] naturalization to the United States.  Your attorney must advise you regarding the possible consequences this case may have on your immigration status."

---

[2]      The Honorable Rhonda I.L. Loo presided over Araiza's circuit court proceedings including her arraignment, no contest plea, and Rule 40 petition.

[3]      HRS § 802E-4 provides:

At the commencement of the court session for arraignment and plea hearings for an offense punishable as a crime under state law, except offenses designated as infractions under state law, the court shall administer the following advisement on the record to all defendants present:

If you are not a citizen of the United States, whether or not you have lawful immigration status, your case may have severe and irreversible consequences, including immediate detention, deportation, or exclusion from admission or denial of naturalization to the United States.  Your attorney must advise you regarding the possible consequences this case may have on your immigration status.  You are not required to disclose your immigration or citizenship status to the court.

4

## A.    Araiza's No Contest Plea

On October 10, 2014, Araiza, who was represented by a deputy public defender (trial counsel), pleaded no contest to both charges and moved for a deferred acceptance of her plea. The plea paperwork, which Araiza and her attorney both signed, specified, "[T]his document has been read to me or has been interpreted for me."  It also contained an advisement about immigration consequences:

> If I am not a citizen of the United States, whether or not I have lawful immigration status, I have the right to receive advice from my lawyer about the specific impact that this case will have, if any, on my immigration status. The entry of a guilty or nolo contendre (no contest) plea, . . . may have the consequences of my immediate detention, deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States.  In some case[s], detention and deportation from the United States will be required.  My lawyer must investigate and advise me about the aforementioned issues prior to . . . entry of a guilty or nolo contendere (no contest) plea . . . and I acknowledge that I have been so advised.  I am not required to disclose my immigration or citizenship status to the court.

(Emphasis added).

The circuit court also read Araiza the immigration advisement from her plea paperwork, informing her that her plea "may have the consequences of your immediate detention, deportation[,] . . . [e]xclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States," and that "[y]our lawyer must investigate and advise you about these issues prior to the . . . entry of a

5

guilty or no contest plea."[4]  Araiza told the court she did not need additional time to consider her plea, and that she had discussed immigration consequences with her attorney and was satisfied with his advice.  Accordingly, the circuit court found she "voluntarily entered a plea of no contest, with the understanding of the nature of the charges and the consequences of her plea."

---

[4]    Like the circuit court's advisement at Araiza's arraignment, this advisement was required by statute.  HRS § 802E-2 (2014) provides:

> Prior to the commencement of trial, entry of a plea of guilty or nolo contendere, or admission of guilt or sufficient facts to any offense punishable as a crime under state law, except offenses designated as infractions under state law, the court shall administer the following advisement on the record to the defendant:
>
> > If you are not a citizen of the United States, whether or not you have lawful immigration status, you have the right to receive advice from your attorney about the specific impact that this case will have, if any, on your immigration status.  The entry of a guilty or nolo contendere plea, admission of guilt or sufficient facts, or conviction, deferred judgment, or deferred sentence may have the consequences of your immediate detention, deportation, exclusion from admission to the United States, or denial of naturalization pursuant to the laws of the United States.  In some cases, detention and deportation from the United States will be required.  Your lawyer must investigate and advise you about these issues prior to the commencement of trial, entry of a guilty or nolo contendere [plea], or admission of guilt or sufficient facts to any offense punishable as a crime under state law, other than those offenses designated as infractions. You are not required to disclose your immigration or citizenship status to the court.
>
> Upon request, the court shall allow the defendant additional time to consider the appropriateness of the plea in light of the advisement as described in this section.

The circuit court subsequently denied Araiza's motion for a deferral and sentenced her to five years of probation on Count One (Theft in the First Degree), and one year of probation on Count Two (Welfare Fraud), with both terms of probation to run concurrently. Araiza did not appeal her conviction.

Four months later, the U.S. Department of Homeland Security detained Araiza without bond and served her with a Notice to Appear, alleging that she was removable because her conviction for Theft in the First Degree was an aggravated felony conviction.

## B. Rule 40 Petition

### 1. Rule 40 Petition and Hearing

Five months after Araiza's conviction, Araiza filed a Hawai'i Rules of Penal Procedure (HRPP) Rule 40 petition,[5]

---

[5] HRPP Rule 40 provides in relevant part:

**(a) Proceedings and Grounds.** The post-conviction proceeding established by this rule shall encompass all common law and statutory procedures for the same purpose, including habeas corpus and coram nobis; provided that the foregoing shall not be construed to limit the availability of remedies in the trial court or on direct appeal. Said proceeding shall be applicable to judgments of conviction and to custody based on judgments of conviction, as follows:

(1) *From Judgment.* At any time but not prior to final judgment, any person may seek relief under the procedure set forth in this rule from the judgment of conviction, on the following grounds:

(continued . . .)

asserting that her trial counsel's failure to advise her of immigration consequences constituted ineffective assistance of counsel and, in turn, prevented her no contest plea from being knowing and intelligent.

Initially, the circuit court summarily denied Araiza's Rule 40 petition without a hearing, finding that her claim of ineffective assistance of counsel had been waived because she failed to raise it on appeal, and that Araiza had not been convicted of an aggravated felony, so "the consequences resulting from [Araiza's] plea were truly unclear." But the ICA reversed and explained that "[c]ontrary to the Circuit Court's assumption, []Araiza's conviction for first-degree theft by deception in violation of HRS § 708-830.5(1)(a) is an aggravated felony under the immigration laws." Salayes-Araiza v. State, No. CAAP-15-0000934, 2016 WL 6948461, at *4 (Haw. App. Nov. 28, 2016). Accordingly, citing Padilla, the ICA concluded that Araiza's "petition sufficiently stated a colorable claim for relief" and remanded for a hearing. Id. at *5.

---

(i) that the judgment was obtained or sentence imposed in violation of the constitution of the United States or of the State of Hawaiʻi;
(ii) that the court which rendered the judgment was without jurisdiction over the person or the subject matter;
(iii) that the sentence is illegal;
(iv) that there is newly discovered evidence; or
(v) any ground which is a basis for collateral attack on the judgment.

8

At the hearing on remand, the parties stipulated to admitting State's Exhibit 1, Araiza's trial counsel's declaration. Araiza's trial counsel stated in his declaration that he discussed immigration consequences with Araiza:

> [N]early every conversation with my client centered on immigration concerns, the looming and almost-certain possibility that she'd be deported, and the difficulty in presenting a defense in this case due to the language barrier, the severity of the charge, and the State's evidence, and I remember that she burst into tears or became teary-eyed anytime I brought up this topic, which was every discussion we had prior to pre-trial.

Trial counsel also advised Araiza and her husband that a plea of guilty or no contest "would result in an almost-certain deportation," and he strongly advised them to speak to an immigration attorney. However, he also explained that sometimes defendants convicted of felonies were not deported:

> As part of this discussion, I informed her that I had discussed this issue with more senior attorneys in my office, and discovered that there were situations in our own office where people who were found guilty of felony offenses were actually not deported, despite their convictions, and for that reason I could not give her 100% confirmation that she'd be automatically deported for the very reason that the immigration is handled by Federal authorities who do not oversee the State courts and that certain defendants seemed to slip through the grasp of what would [] otherwise be an automatic deportation.

(Emphases added).

Overall, trial counsel advised Araiza that she needed to weigh "risking automatic deportation with no jail (upon a plea agreement) versus going to trial and possibly being found guilty, serving jail and then being deported (which would be far

worse)[.]"[6]

During the Rule 40 hearing, trial counsel testified on behalf of the State.  Consistent with his declaration, trial counsel testified that he advised Araiza she would be subject to almost-certain deportation if convicted.  Deportation was not certain because his office "had criminal defendants who were convicted of felonies who are not automatically deported."

When pressed about his advice on cross-examination, trial counsel conceded he did not know, and had never advised Araiza, that state criminal records were automatically forwarded to Immigration and Customs Enforcement.  Moreover, trial counsel did not tell Araiza she would be automatically detained after her plea, even though he knew that that would happen and had advised her she would not go to jail if she pleaded no contest.

Trial counsel also admitted that he did not tell Araiza that her conviction would be for an "aggravated felony," or that a conviction for an aggravated felony precluded any

---

[6]    Trial counsel also stated in his declaration that he had wanted to negotiate a dismissal if Araiza could raise "the full amount of restitution money," but that Araiza and her husband were unable to do so. When he learned they did not have the money,

> I again explained that there could be immigration consequences, especially with a Theft in the First Degree conviction, and that deportation would be almost certain if convicted or put on probation.  I again proposed that we could just take our chances at trial and try for an acquittal and [Araiza] indicated she did not want to risk losing at trial and again was very emotional during the conversation.

possible relief from removal.  Although he did not tell Araiza she was pleading to an "aggravated felony," he testified that he told her it was "a more serious felony," and explained "the difference between a Class B and a Class C [felony.]"

When asked, he also said that he knew that someone deported for an aggravated felony would never be able to naturalize, but that he did not tell Araiza that: "I didn't go through the specifics of the law because almost certain deportation, a reasonable inference would be that once you're deported, you're not allowed to come back.  But that's why I also requested that she seek the advice of an immigration attorney."

When Araiza's attorney explained that inadmissibility and inability to naturalize were two different things, trial counsel conceded he did not advise Araiza of either consequence.

Trial counsel testified that he was not aware of Padilla, and that he never contacted immigration attorneys about his cases "because of client confidentiality," even though the public defender's office "encouraged us to contact immigration attorneys personally."  Finally, when asked if he had a duty to research immigration consequences, he replied, "I believe that this is an issue that keeps on coming up in courts and that keeps on changing, especially with the presidency. . . .  Back then I didn't believe I had the duty to know immigration law as

much as an immigration attorney."

Araiza herself also testified at the hearing. She testified that she had lived in Hawaiʻi for twenty-two years. She was married and had two children, both born in the United States. She had a green card — and therefore was an LPR — and had hoped to become an American citizen.

Araiza did not know what an aggravated felony was, and she testified that trial counsel had not advised her about possible immigration consequences:[7]

> What I'm seeing, that he wanted to finish the case fast, because he told me to plead guilty, to just get an agreement; that I had to give $3,000; I was going to -- I was not going to go to jail; I was going to get an approval for five years [deferral]; and that I should continue with the payments; and that everything was going to be all right. So I felt relaxed on that sense.

When asked if she would have gone to trial had she known about the immigration consequences of her plea, Araiza replied, "I would have gone and fight."

Araiza used a Spanish-speaking interpreter during the Rule 40 hearing. Almost as soon as the hearing began, the circuit court interrupted the proceedings to instruct the interpreter twice that "[e]verything [Araiza] says you need to translate for us." Shortly after the first witness began

---

[7]     Araiza testified that trial counsel had not given her any legal advice, but immediately went on to explain the non-immigration legal advice he had given her.

testifying, the circuit court interrupted again to ask if the interpreter was "getting all this," to which the interpreter responded, "No. . . . [I'm] getting a little behind. But I'm getting the whole idea." The court said, "No," and the interpreter said, "I can only translate ideas, no words." During Araiza's testimony, the court again instructed the interpreter to translate everything Araiza said. However, when asked if Araiza wanted a different interpreter, Araiza's attorney said, "No."

2. **The Circuit Court's Findings of Facts and Conclusions of Law**

The circuit court denied Araiza's Rule 40 petition in a written order filed on September 6, 2017. The circuit court found trial counsel credible and that he had advised Araiza a no contest plea or guilty conviction "would result in an almost certain deportation, but could not provide 100% confirmation that [Araiza] would be deported." The court also noted that it had advised Araiza that her case could have immigration consequences and that her attorney must advise her about them. By contrast, the circuit court found Araiza's "claims that [trial counsel] did not give her any legal advice, including any advice pertaining to possible immigration consequences, are not credible."

Accordingly, the circuit court found that trial

13

counsel "adequately advised [Araiza] of the possible immigration and/or deportation consequences of her no contest pleas."  The court further concluded that Araiza "had a full understanding of what her no contest pleas connoted, [and] their direct consequences; and therefore, [Araiza's] no contest pleas were knowingly, intelligently, and voluntarily entered."

In sum, the circuit court concluded "in light of all the circumstances, [Araiza] has failed to meet her burden of demonstrating that her counsel's performance was not objectively reasonable," and that "there were specific errors or omissions reflecting her counsel's lack of skill, judgment, or diligence." The circuit court therefore "conclude[d] that [Araiza] was not provided ineffective assistance of counsel under the State of Hawai'i or United States Constitutions[.]"

## B.   ICA Memorandum Opinion

Araiza appealed to the ICA, arguing that the circuit court erred in concluding that trial counsel did not provide ineffective assistance of counsel by providing deficient immigration advice[8] and, for the first time on appeal, that the circuit court did not provide Araiza with a qualified interpreter during her Rule 40 hearing.

---

[8]     Araiza also argued in her Rule 40 petition and application for writ of certiorari that she was prejudiced by trial counsel's advice because she would not have pleaded no contest had she known that deportation was mandatory.  The State did not dispute this argument.

14

The ICA affirmed the circuit court's denial of Araiza's Rule 40 petition. First, the ICA held that the circuit court's factual finding that trial counsel advised Araiza she faced "almost-certain deportation" was not clearly erroneous because it was supported by evidence in the record and was based on the court's credibility assessment.

With respect to the sufficiency of trial counsel's immigration advisement, the ICA decided that "the Supreme Court has not consistently characterized the immigration consequence of an aggravated felony conviction" and therefore "has not made it clear whether the immigration consequence for an aggravated felony is absolute or qualified." The ICA conducted its own analysis of the consequences of an aggravated felony.

First, it held that the statutory language in 8 U.S.C. § 1227(a)(2)(A)(iii) and 8 U.S.C. § 1228(c) regarding aggravated felonies "does not support Araiza's argument" because it "does not state that deportation is automatic, mandatory, or certain."

Second, the ICA concluded that removal is not automatic because "[t]here are also administrative proceedings and limited judicial review available," since immigration judges conduct removal proceedings. While the ICA recognized that federal courts have no appellate jurisdiction over final orders of removal where the basis for removal was an aggravated felony conviction, the ICA concluded that since federal courts retain

15

jurisdiction over questions of law, "even when removal proceedings are initiated, the result is not always automatic deportation."

Third, quoting Chacon v. State, 409 S.W.3d 529, 537 (Mo. Ct. App. 2013), the ICA held that "Padilla does not require that counsel use specific words to communicate to a defendant the consequences of entering a plea." And it cited several decisions from state and federal courts that approved of qualifying language such as "virtual certainty" or "almost certainly will." Thus, "[t]rial counsel was not ineffective when he provided Araiza with correct advice, informing her that deportation was 'almost certain' if she pleaded no contest."

Finally, the ICA held that the circuit court did not plainly err by failing to provide Araiza with a qualified interpreter based on the presumption that an interpreter acted regularly in the course of their duty. The ICA observed that Araiza did not prove the interpreter had not been certified when the Rule 40 hearing occurred in June 2017, and that there is no requirement an interpreter be formally certified, nor that a trial court "express[ly]" find an interpreter to be qualified.

Thus, the ICA affirmed the circuit court's order in its entirety. Araiza timely filed an application for writ of certiorari.

16

## III. STANDARDS OF REVIEW

### A. Ineffective Assistance of Counsel

"The proper standard for claims of ineffective assistance of counsel on appeal is whether, 'viewed as a whole, the assistance provided was within the range of competence demanded of attorneys in criminal cases.'" State v. DeLeon, 131 Hawai'i 463, 479, 319 P.3d 382, 398 (2014) (quoting Dan v. State, 76 Hawai'i 423, 427, 879 P.2d 528, 532 (1994)).

> The defendant has the burden of establishing ineffective assistance of counsel and must meet the following two-part test: 1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense.

Id. at 478–79, 319 P.3d at 397–98 (quoting State v. Wakisaka, 102 Hawai'i 504, 514, 78 P.3d 317, 327 (2003)).

Unlike the federal standard, defendant need only show "a possible impairment, rather than a probable impairment, of a potentially meritorious defense. A defendant need not prove actual prejudice." Id. at 479, 319 P.3d at 398 (quoting Wakisaka, 102 Hawai'i at 514, 78 P.3d at 327).

### B. Court Interpreters

The court has discretion to appoint an "interpreter of its own selection[.]" HRPP Rule 28(b). Under HRE Rule 604, interpreters must be qualified to the same extent as an expert witness pursuant to HRE Rule 702. Thus, as with an expert

17

witness, a trial court's determination whether a witness is qualified to be an interpreter is reviewed for abuse of discretion. HRE Rule 604 cmt. ("Under Hawaii law, preliminary determination of [an interpreter's] qualifications is a matter within the discretion of the court[.]").

## IV. DISCUSSION

### A. Araiza's Trial Counsel Provided Inadequate Immigration Advice

According to trial counsel's own testimony,[9] he gave Araiza three pieces of advice regarding immigration consequences: (1) a no contest plea would result in "almost certain deportation," but that (2) his office has had defendants "convicted of felonies who are not automatically deported," and that (3) "immigration is handled by federal authorities who do not oversee state courts[.]" He told Araiza, in sum, that she needed to weigh "<u>risking</u> automatic deportation" as the result of a plea, versus "going to trial and possibly being found guilty . . . and then <u>being</u> deported[.]"

The ICA decided trial counsel's advisement satisfied his professional duty to advise Araiza about the immigration consequences of her no contest plea. For the following reasons,

---

[9] The circuit court found trial counsel credible, and the ICA appropriately held that the circuit court's finding regarding trial counsel's credibility was not clearly erroneous because there was evidence in the record to support it.

18

we disagree.

### 1.   The Right to Immigration Advice

Under Padilla, the sixth amendment of the United States Constitution guarantees a defendant the right to receive immigration advice from their defense attorney.  559 U.S. at 368 (mandating advice where "the terms of the relevant immigration statute are succinct, clear, and explicit in defining the removal consequence for [the defendant's] conviction").  Such advice is necessary to "ensure that no criminal defendant — whether a citizen or not — is left to the 'mercies of incompetent counsel.'"  Id. at 374.

This same right can be independently found in article I, section 14 of the Hawai'i Constitution since, "under Hawaii's Constitution, defendants are clearly afforded greater protection of their right to effective assistance of counsel."  State v. Aplaca, 74 Haw. 54, 67 n.2, 837 P.2d 1298, 1305 n.2 (1992).

We note that the Hawai'i Legislature has also acknowledged that such advice is constitutionally required.  Indeed, it enacted HRS § 802E-4 and amended HRS § 802E-2 to "conform [the statutes] to current federal court holdings," including Padilla, and to ensure a defendant is "adequately advise[d] . . . of the defendant's Sixth Amendment right to competent and specific advice on immigration consequences of a criminal conviction."  S. Stand. Comm. Rep. No. 1376, in 2013

19

Senate Journal, at 1518.

Thus, by statute, the court must inform defendants that their attorneys will "investigate and advise" them about "the specific impact" the case will have on their immigration status, including "[1] detention, [2] deportation, [3] exclusion from admission to the United States, or [4] denial of naturalization pursuant to the laws of the United States."  HRS §§ 802E-2, 802E-4.  Further, the court has to tell defendants that their attorney must advise them whether "detention and deportation from the United States will be required."  HRS § 802E-2.

Accordingly, under Padilla, and independently, under article I, section 14 of the Hawai'i Constitution, defense counsel must adequately advise their clients regarding the immigration consequences of a plea.  The failure to do so renders counsel's advice deficient under the United States and Hawai'i Constitutions.

2.   **The Immigration Consequences of an Aggravated Felony Conviction**

Trial counsel's advice to Araiza did not capture the severity of a plea to an aggravated felony.  See Sessions v. Dimaya, 138 S. Ct. 1204, 1211 (2018) ("[R]emoval is a virtual certainty for an alien found to have an aggravated felony conviction, no matter how long [she] has previously resided

20

here."). Araiza's conviction for Theft in the First Degree constitutes an aggravated felony under 8 U.S.C. § 1101(a)(43)(M)(i) ("[A]n offense that . . . involves fraud or deceit in which the loss to the victim or victims exceeds $10,000[.]"). "Aggravated felony" is a term of art: 8 U.S.C. § 1101(a)(43) lists twenty-one categories of offenses that constitute aggravated felonies, and any immigrant convicted of an aggravated felony "shall . . . be removed." 8 U.S.C. § 1227(a) (emphasis added).

Trial counsel explained that he told Araiza she was pleading to a "more serious felony," and explained the difference between class B and class C felonies. But contrary to trial counsel's apparent belief, the term "aggravated felony" does not include all serious felonies, and designation as an aggravated felony does not depend on the class of felony. Lopez v. Gonzales, 549 U.S. 47, 59-60 (2006) (holding that the "aggravated felony" classification turns on analogies to federal law and noting that state misdemeanors can constitute aggravated felonies).

The consequences of an aggravated felony conviction are well-documented. See, e.g., Richard D. Steel, Steel on Immigration Law § 13:16 (2020 ed.); Kathy Brady, Practice Advisory: Aggravated Felonies, Immigrant Legal Resource Center (Apr. 2017), https://perma.cc/N3WM-97W7. And Congress has made

it clear that "a listed offense should lead to swift removal, no matter whether it violates federal, state, or foreign law." Torres v. Lynch, 136 S. Ct. 1619, 1627 (2016).

Such a conviction makes an immigrant removable (i.e., deportable) under 8 U.S.C. § 1227(a)(2)(A)(iii), and unlike other grounds of removability, anyone convicted of an aggravated felony is "conclusively presumed to be deportable" under 8 U.S.C. § 1228(c).  Removal is considered mandatory because 8 U.S.C. § 1227(a) provides that an immigrant falling under one of the listed categories "shall" be removed.  Further, an aggravated felony conviction makes an immigrant ineligible for relief from removal, including cancellation of removal, 8 U.S.C. § 1229b(a)(3), adjustment of status, 8 U.S.C. § 1229b(b)(1)(C), asylum,[10] 8 U.S.C. § 1158(b)(2)(B)(i), or voluntary departure,[11] 8 U.S.C. § 1229c(a)(1).  See Lopez, 549 U.S. at 50–51 (discussing these consequences).

In addition, an aggravated felony conviction reduces an immigrant's procedural protections during removal

---

[10]    Additionally, a conviction for an aggravated felony is grounds for termination of asylum status.  8 U.S.C. § 1158(c)(2)(B).

[11]    "Voluntary departure" means choosing to leave voluntarily in lieu of being removed.  8 U.S.C. § 1229c(a)(1).  It enables immigrants to avoid certain grounds for inadmissibility that are contingent on having been deported for a crime.  See 8 U.S.C. § 1182(a)(9)(A)(i).  However, because it is not available to an immigrant convicted of an aggravated felony, it is impossible for someone with this type of conviction to avoid becoming permanently inadmissible after removal.

22

proceedings. They are subject to mandatory detention without bond. 8 U.S.C. § 1226(c)(1)(B); Demore v. Kim, 538 U.S. 510, 517–18 (2003) ("Section 1226(c) mandates detention during removal proceedings for a limited class of deportable aliens — including those convicted of an aggravated felony."). But see Rodriguez v. Robbins, 715 F.3d 1127, 1138 (9th Cir. 2013) (holding a bond hearing must be held once detention lasts more than six months). Further, immigrants convicted of an aggravated felony are subject to expedited removal proceedings and, under certain circumstances, can be deported without a hearing before an immigration judge. 8 U.S.C. § 1228(b); see also Richard D. Steel, Steel on Immigration Law § 14:5 (2020 ed.).

Finally, the immigration consequences of an aggravated felony conviction go beyond removal: Such a conviction makes an immigrant permanently inadmissible, 8 U.S.C. § 1182(a)(9)(A)(i), and precludes that person from ever becoming an American citizen. Elmakhzoumi v. Sessions, 883 F.3d 1170, 1172 (9th Cir. 2018) (holding aggravated felony conviction makes an immigrant "permanently ineligible for naturalization").[12]

---

[12] Advice about these consequences is required by HRS § 802E-2, and at least one state has held that defense attorneys are constitutionally obligated to advise defendants of all clear statutory consequences of a plea, including inadmissibility and ineligibility for naturalization, noting that

(continued . . .)

Thus, trial counsel's advice to Araiza on the nature of the felony to which she pleaded no contest failed to convey that "aggravated felony" is a term of art connoting severe and permanent consequences.

3.   **Inconsistencies between the ICA's Analysis and Existing Federal Law**

The ICA concluded that because the Supreme Court has not "made it clear whether the immigration consequence for an aggravated felony conviction is absolute or qualified," deportation was not "certain" given the statutory language and procedural protections available.  This analysis is in tension with existing federal law.

First, it is true that the Supreme Court sometimes uses qualifying language with respect to an aggravated felony conviction.  E.g., Dimaya, 138 S. Ct. at 1211 ("virtual certainty"); Chaidez v. United States, 568 U.S. 342, 352 (2013) ("nearly an automatic result").  But the Court has not qualified the magnitude of risk a criminal defendant must understand when contemplating a plea to an aggravated felony.  In Padilla, the defendant pleaded guilty to transporting a large quantity of marijuana.  559 U.S. at 359.  The Supreme Court recognized that his plea "made his deportation virtually mandatory," and

doing so is the "prevailing professional norm[]" for criminal defense attorneys.  Diaz v. State, 896 N.W.2d 723, 730-31 (Iowa 2017) (citing ABA standards).

24

therefore held that "constitutionally competent counsel would have advised him that his conviction for drug distribution made him subject to <u>automatic</u> deportation." <u>Id.</u> at 359-60 (emphases added).

More recently, in <u>Lee v. United States</u>, 137 S. Ct. 1958, 1968-69 (2017), the Supreme Court considered the significance of knowing deportation was "certain" versus "almost certain." In <u>Lee</u>, the defendant pleaded guilty to an aggravated felony after his attorney failed to advise him of immigration consequences, which the Court explained made the defendant subject to "mandatory deportation." <u>Id.</u> at 1963. The government conceded that Lee's attorney had been deficient but argued that Lee had not been prejudiced because he had no viable defense for trial. <u>Id.</u> at 1964. The Supreme Court rejected that argument, holding that while the difference between "certain" and "almost certain" deportation may seem slight, a defendant concerned about immigration consequences should know that deportation is "certain" because it may affect their decision:

> But for his attorney's incompetence, Lee would have known that accepting the plea agreement would <u>certainly</u> lead to deportation. Going to trial? <u>Almost</u> certainly. If deportation were the "determinative issue" for an individual in plea discussions, as it was for Lee; if that individual had strong connections to this country and no other, as did Lee; and if the consequences of taking a chance at trial were not markedly harsher than pleading, as in this case, that "almost" could make all the difference.

<u>Id.</u> at 1968-69.

25

Thus, the ICA's conclusion that "the Supreme Court has not consistently characterized this immigration consequence of an aggravated felony conviction," overlooks the Court's clear admonition that defendants must know if a plea will "certainly lead to deportation." Id.

Second, the ICA's conclusion that "[t]he relevant statutory language [in 8 U.S.C. § 1227(a)(2)(A)(iii)] does not state that deportation is automatic, mandatory, or certain," conflicts with the plain language of the statute and misapprehends the meaning of "deportable." An earlier section of 8 U.S.C. § 1227 provides that "deportable" means an immigrant "shall . . . be removed." 8 U.S.C. § 1227(a); see also Padilla, 559 U.S. at 368-69 (explaining removal is "presumptively mandatory" because "the text of the statute . . . specifically commands removal"); Encarnacion v. State, 763 S.E.2d 463, 465 (Ga. 2014) ("The [Immigration and Nationality Act] . . . defines 'deportable' to mean that the alien is subject to mandatory, rather than discretionary, removal. . . . Thus, the applicable federal statutes make it clear that a conviction for an aggravated felony automatically triggers the removal consequence and almost always leads to deportation." (citations omitted)). Consequently, the ICA's reading of the statute puts Hawai'i at odds with other jurisdictions' interpretations of "shall" in 8 U.S.C. § 1227.

26

Third, the ICA concluded removal is not automatic because "[t]here are . . . administrative proceedings and limited judicial review available to defendants convicted of an aggravated felony making deportation or removal less than automatic," citing 8 U.S.C. § 1229a(a)(1) (an immigration judge (IJ) conducts proceedings deciding removability).  This is incorrect: While an IJ conducts most removal proceedings, they do not necessarily conduct expedited removal proceedings for aggravated felonies, which are governed by 8 U.S.C. § 1228, not 8 U.S.C. § 1229a.  Moreover, under 8 U.S.C. § 1228, immigrants who are not LPRs or who have conditional LPR status can be removed automatically without a hearing.  8 U.S.C. § 1228; see also Richard D. Steel, Steel on Immigration Law § 14:5 (2020 ed.).

Accordingly, the ICA's reasoning is erroneous.  We now address what immigration advice a defense attorney must convey to their clients to provide effective assistance of counsel under the United States and Hawai'i Constitutions.

4.  **In Order to be Effective, a Criminal Defense Attorney Must Accurately Convey that Deportation will be "Required"**

In assessing the sufficiency of a defense attorney's immigration advice, the court must determine whether the advice given accurately conveys the legal consequences of a plea and the magnitude of the risk.  United States v. Bonilla, 637 F.3d

27

980, 984 (9th Cir. 2011). Rather than focusing solely on the defense attorney's specific wording, "the focus of the court's inquiry must be on the essence of the information conveyed to the client to ensure that counsel clearly and accurately informed the client of the immigration consequences under federal law in terms the client could understand." Budziszewski, 142 A.3d at 250.

Even technically-accurate immigration advice can be deficient if the advice as a whole "understates the likelihood that [a defendant] would be removed." United States v. Rodriguez-Vega, 797 F.3d 781, 791 (9th Cir. 2015); Encarnacion, 763 S.E.2d at 466 ("In light of [the defendant's] conviction for an aggravated felony, defense counsel had no reason to believe there was a realistic probability that his client would escape deportation. It follows that defense counsel performed deficiently by failing to advise petitioner that he would be deported as a result of his guilty plea[.]" (emphasis added)); see also State v. Blake, 132 A.3d 1282, 1292 (N.J. Super. Ct. App. Div. 2016) ("[A]n attorney may fail to provide effective assistance if he or she minimizes the risk of removal, and thereby misleads a client.").

When defense counsel tells a defendant they might not be deported despite being removable, the Connecticut Supreme Court has set forth a two-step test:

28

> First, the court must determine whether counsel complied with Padilla by explaining to the client the deportation consequences set forth in federal law.  The advice must be accurate, and it must be given in terms the client could comprehend.  If the petitioner proves that counsel did not meet these standards, then counsel's advice may be deemed deficient under Padilla.  If counsel gave the advice required under Padilla, but also expressed doubt about the likelihood of enforcement, the court must also look to the totality of the immigration advice given by counsel to determine whether counsel's enforcement advice effectively negated the import of counsel's advice required under Padilla about the meaning of federal law.

Budziszewski, 142 A.3d at 251.

In Budziszewski, the defense attorney customarily advised his noncitizen clients that "if the law is strictly enforced, it will result in deportation, but it's been my experience that the law is not strictly enforced.  So you take a chance."[13]  Id. at 247 (alterations omitted).  The Connecticut Supreme Court explained that "counsel is not required to provide the client with predictions about whether or when federal authorities will apprehend the client and initiate deportation proceedings," but that if counsel does give such advice, "counsel must still impress upon the client that once federal authorities apprehend the client, deportation will be practically inevitable under federal law."  Id. at 250-51.

---

[13]  The Connecticut Supreme Court remanded the case for a new hearing because while the attorney testified to "his usual practice," "[t]he habeas court made no findings of fact regarding what [the attorney] actually told the petitioner about what federal law mandated or what [the attorney] might have stated about the likelihood of enforcement."  Budziszewski, 142 A.3d at 247, 251.  The court also noted that "there was no separate consideration by the habeas court about whether counsel's advice regarding enforcement negated the import of counsel's advice about what federal law mandated regarding deportation."  Id. at 251.

29

Other states have similarly recognized that while there is no magic phrase an attorney must use, "[c]ounsel . . . was obligated to provide to his client, in language that the client could comprehend, the information that presumptively mandatory deportation would have been the legal consequence of pleading guilty." Commonwealth v. DeJesus, 9 N.E.3d 789, 795 (Mass. 2014). In DeJesus, the Massachusetts Supreme Judicial Court found advice that the defendant would "face deportation" and would be "eligible for deportation" insufficient because it did not advise the defendant "that all of the conditions necessary for removal would be met by the defendant's guilty plea, and that, under Federal law, there would be virtually no avenue for discretionary relief once the defendant pleaded guilty and that fact came to the attention of Federal authorities." Id. at 796; see also Diaz v. State, 896 N.W.2d 723, 732 (Iowa 2017) (finding ineffective assistance of counsel where "counsel never mentioned the crime constituted an aggravated felony, and never attempted to explain the sweeping ramifications of that classification" (citations omitted)).

Further, HRS § 802E-2 requires a trial court to advise defendants that they have the "right" to be given specific immigration advice and that their attorney "must investigate and advise" them if their plea would mean that "detention and deportation from the United States will be required." HRS

30

§ 802E-2 (emphasis added); see In re Yung-Cheng Tsai, 351 P.3d 138, 143 (Wash. 2015) (explaining that the "plain language" of Washington's immigration-advisement statute establishes an "unequivocal" right to immigration advice).

Here, we hold that under the United States and Hawai'i Constitutions, Araiza received inadequate immigration advice to meet the requirements of effective assistance of counsel. That counsel used the phrase "almost certain deportation" does not end the inquiry; trial counsel's statements must be considered as a whole. "[A]lmost certain deportation" was not the extent of his advice — he also downplayed the severity of the risk of deportation by telling Araiza that his office had seen defendants convicted of felonies who were not deported and that immigration officials do not know about state court proceedings. These statements were very similar to the advice at issue in Budziszewski, and we find them concerning for the same reason as the Connecticut Supreme Court: The combined effect was to convey that deportation was very likely if Araiza pleaded no contest — and possibly more likely if she went to trial — but that there was a realistic possibility she would not be deported because it had not happened to other similarly-situated defendants. Indeed, the equivocal nature of trial counsel's advice is evident from the fact that he told her a plea was "risking automatic deportation," whereas being found guilty after a trial

31

meant she would be deported.

These statements failed to accurately convey the serious legal consequence of Araiza's plea: "that all of the conditions necessary for removal would be met by the defendant's guilty plea, and that, under Federal law, there would be virtually no avenue for discretionary relief[.]" DeJesus, 9 N.E.3d at 796; Encarnacion, 763 S.E.2d at 466 ("In light of [the defendant's] conviction for an aggravated felony, defense counsel had no reason to believe there was a realistic probability that his client would escape deportation.").

Moreover, since Araiza's plea paperwork (and the court's later oral advisement) informed her that trial counsel had to tell her if detention and deportation would be "required," trial counsel's advice that deportation was "almost" certain because some defendants were not deported created a misleading impression that deportation was not legally required. See Bonilla, 637 F.3d at 984–85 (concluding lawyer's omission could mislead defendant into believing there would not be adverse immigration consequences).

While the ICA is correct that, as noted in Chacon, 409 S.W.3d at 537, "Padilla does not require that counsel use specific words to communicate to a defendant the consequences of entering a guilty plea," HRS § 802E-2 promises that defense attorneys will advise their clients if "detention and

32

deportation from the United States will be required." Indeed, the ICA's holding that trial counsel did not need to advise Araiza that deportation was "automatic, mandatory, or certain" renders HRS § 802E-2's requirement meaningless. Accordingly, we hold that defense attorneys must advise their clients using language that conveys that deportation "will be required" by applicable immigration law for an aggravated felony conviction. Since Araiza's trial counsel failed to adequately advise Araiza of the immigration consequences of her plea, the circuit court erred in concluding he provided her effective assistance of counsel.

B. **When a Trial Court Appoints an Interpreter who has not been Certified by the Judiciary, the Court Must Conduct a Brief Inquiry on the Record to Establish that the Interpreter is Qualified**

Araiza alleges that the circuit court plainly erred during her Rule 40 hearing by appointing an interpreter who, according to Araiza, was not "certified and/or qualified." Nothing in the record demonstrates the interpreter's qualifications. It appears Araiza's interpreter was neither a

certified[14] interpreter nor a registered[15] interpreter for the Judiciary when the Rule 40 hearing was held in June 2017.  While we decline to decide whether the appointment of this interpreter constituted plain error in light of our disposition of this case, we offer some guidance on the procedures needed to ensure an interpreter is qualified.

"All persons involved in proceedings before the Hawaiʻi State Courts, regardless of literacy or proficiency in the English language, have the right to equal access to the courts and to services and programs provided by the Hawaiʻi State Courts."  HRCSLI Rule 1.2.[16]  A trial court has the discretion to appoint an interpreter "of its own selection."  HRPP Rule 28(b).  And HRCSLI Rule 14.1 does not require formal certification, only that an interpreter be qualified under court rules.

---

[14]    "Certified" means that the interpreter has passed the applicable language exam from the National Center for State Courts.  Hawaiʻi's Office of Equality and Access to the Courts (OEAC) uses six tiers of designation for interpreters that range from "registered" to "certified master."  In order to be deemed "certified" (tier 4), the interpreter must receive a score of 70% on the exam.  To be a "certified master" (tier 6), the interpreter must receive 80% on the exam.  Right now, there is no tier 5 designation for spoken-language interpreters.  HRCSLI Appendix A.

[15]    "Registered" means that a person has fulfilled the minimum requirements necessary to be on the list of interpreters for the judiciary.  In order to be registered, the lowest available tier, an interpreter must pass a written English proficiency test and an ethics exam, attend a 2-day basic orientation workshop, and pass a criminal background check.  However, proficiency in the foreign language is not assessed.  HRCSLI Appendix A.

[16]    In March 2019, this court ordered that the previous version of these rules, the Hawaiʻi Rules for Certification of Spoken and Sign Language Interpreters, be vacated and replaced with the HRCSLI, effective July 2019.  This change did not affect the substance of the relevant rules.

34

In 1995, the Chief Justice adopted policies for interpreted proceedings in the state courts, which were incorporated into the HRCSLI as Appendix B. As relevant here, section I(D) governs qualifications of interpreters and provides that if an interpreter is not on the list of recommended interpreters, the court must conduct an inquiry:

> Courts should use interpreters who can (a) understand terms generally used in the type of proceeding before the court, (b) explain these terms in English and the other language being used, and (c) interpret these terms into the other language being used. If a list of recommended interpreters is not available, or if it appears an interpreter cannot understand or interpret the terms used in the proceeding, the judge should conduct a brief examination of the interpreter to determine if the interpreter is qualified to interpret the proceeding. When conducting the examination the judge should, if possible, seek the assistance of an interpreter whose qualifications have been established.

HRCSLI Appendix B, § I(D) (emphases added).

HRCSLI Appendix B comports with the HRE, which establishes that an interpreter is regarded as an expert under HRE Rule 702 "for the purpose of determining his qualifications to interpret or to translate in the matter at issue." HRE Rule 604 cmt. In other words, in accordance with HRE Rule 702, there must be evidence in the record that the interpreter was "qualified as an expert by knowledge, skill, experience, training, or education." The commentary to HRE Rule 604 notes that the rule is identical to the Federal Rules of Evidence Rule 604.

If an interpreter has been certified by the judiciary,

35

there is often no need for the court to conduct an inquiry because the interpreter has already been qualified through "training and education."[17]  27 Charles Alan Wright, Arthur R. Miller & Victor J. Gold, Federal Practice & Procedure § 6054 (2d ed. 2020) ("As a practical matter, however, a court usually need not exercise its power to reexamine the qualifications of a certified interpreter.").  However, when an interpreter has not been certified, some other kind of foundation of their qualifications must be established: "Rule 604 does not establish a specific procedure for the courts to follow in determining interpreter qualifications.  One way or the other, however, the record must reflect that the individual in question had the requisite ability to interpret."  Id.

Accordingly, we hold that, if a court appoints an interpreter who is not certified by the judiciary as proficient in the foreign language, the court "should conduct a brief examination of the interpreter to determine if the interpreter

---

[17]    Because registered interpreters are not assessed for language proficiency, that designation may be insufficient to demonstrate expert qualifications under HRE Rules 604 and 702.  Similarly, certification in the applicable foreign language may be insufficient if the party needing an interpreter speaks a different dialect: "[W]here a language features multiple dialects, an interpreter certified for that language might not be sufficiently fluent in the specific dialect employed by a given witness.  In such a case, the certified interpreter would not qualify as an expert under Rule 702[.]"  27 Charles Alan Wright, Arthur R. Miller & Victor J. Gold, Federal Practice & Procedure § 6054 (2d ed. 2020) (footnote omitted).

is qualified to interpret the proceeding."  HRCSLI Appendix B,
§ I(D).

## V.   CONCLUSION

For the reasons set forth in this opinion, we vacate the ICA's April 23, 2020 judgment on appeal and the circuit court's findings of fact, conclusions of law, and order denying petitioner's petition to vacate, set aside or correct illegal sentence through a writ of habeas corpus pursuant to HRPP Rule 40 filed on September 6, 2017, and remand to the circuit court for further proceedings consistent with this opinion.

| | |
|---|---|
| Hayden Aluli<br>for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Mark R. Simonds<br>for respondent | /s/ Sabrina S. McKenna |
| (Peter A. Hanano<br>on the brief) | /s/ Michael D. Wilson |
| | /s/ R. Mark Browning |

